**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**UNITED STATES OF AMERICA**                                          **PLAINTIFF**

**v.**                              **CASE NO. 5:15-CR-50064-001**

**GREGORY ROBERT HEALD**                                          **DEFENDANT**

### MEMORANDUM OPINION

*"The Fourth Amendment Must Prevail."*

Justice Antonin Scalia (1936 – 2016)[1]

On July 16, 2015, the police stopped Gregory Heald for a traffic infraction, and then detained him for approximately forty-five minutes so that a K-9 team could conduct an open-air drug sniff of his vehicle. After the sniff, the police searched Heald's vehicle and discovered narcotics, paraphernalia, a firearm, and a cell phone with incriminating information on it. Heald was arrested, and now faces charges stemming from the incident. He argues, however, that both his prolonged detention and the search of his vehicle violated his Fourth Amendment rights. The Court disagrees with the former argument, but agrees with the latter. Accordingly, the evidence found in Heald's vehicle and on his cell phone must be suppressed as fruits of an illegal search.

## I.      BACKGROUND FINDINGS OF FACT

Heald filed his Motion to Suppress (Doc. 17) on November 17, 2015. The Court held a hearing on the Motion on January 27, 2016, which was later concluded on February 8, 2016. The findings of facts in this Opinion come from that hearing and the

---

[1] *Maryland v. King*, 133 S. Ct. 1958, 1989 (2013) (Scalia, J., dissenting).

Court's review of the evidence submitted during it.[2] These findings of facts are necessarily lengthy, as analyzing both reasonable suspicion and probable cause requires a totality of the circumstances approach. Therefore, the Court has divided this section into five subparts: Subsection A includes the Court's findings related to certain occurrences at 2014 Ina Avenue in Springdale, Arkansas; Subsection B includes findings about the initial portion of Heald's stop; Subsection C includes findings about the middle portion of Heald's stop; Subsection D includes certain findings about Bosco the K-9 and Officer Hernandez; and Subsection E includes findings about the open-air drug sniff. Finally, the Court makes certain additional findings of facts in its Discussion Section, below.

### A.    Suspicious Activity Reported at 2014 Ina Ave. #A

In July of 2015, a concerned citizen of Springdale, Arkansas began contacting Springfield Police Department ("SPD") detective John Mackey. The citizen advised Detective Mackey that her neighbor, Butch Greenlee, who resided at 2014 Ina Ave. #A, was engaging in suspicious activity. Namely, she told Detective Mackey that Greenlee would come home after being gone for several days, back his vehicle into his driveway, and remove the door panels from the vehicle. Shortly thereafter, vehicle traffic around the residence would increase, with vehicles coming and then leaving a short time later during all hours through late night and early morning. Detective Mackey believed that the behavior could be indicative of drug trafficking activity.

---

[2] Transcripts of Officer Hernandez's (Doc. 29) and Steven Nicely's (Doc. 30) testimony were added to the record on February 2, 2016. Citations made in this Opinion to other witness testimony refer to the Court's real-time transcript of the hearing, i.e. an unofficial record.

On July 16, 2015, the concerned citizen called Detective Mackey and informed him that Greenlee had just returned home after being gone for two days, had backed his vehicle in his driveway, and was removing the door panels from the vehicle. Acting on this information, Detective Mackey and Detective Cody Ross drove to the location and observed a tan Chevy Blazer backed in near a garage door with both side doors opened and someone kneeling beside the driver side door. The detectives then left to acquire an additional vehicle from which to conduct surveillance.

When they returned, the detectives saw that a silver Toyota Camry was parked in the driveway as well. Detective Mackey also spotted the concerned citizen standing outside of her home. At that point he called the citizen, who told him that she did not see the silver Toyota Camry arrive, but did observe some individuals taking packages from the areas of the Chevy Blazer's door panels into the garage. She also reported seeing a bald white man carry two packages out to the silver Toyota Camry. She then made eye contact with him, spooked him, turned around, and did not know whether he put the packages in the Camry or carried them back to the house.[3] As the detectives later found out, the bald white man was Gregory Heald.

Shortly after returning to the scene, the detectives saw Heald exit Greenlee's apartment and drive away in the silver Toyota Camry. Detective Ross followed the vehicle to a Harp's Foods supermarket, and observed Heald enter the market. Approximately five minutes later, Heald returned from the market carrying a bag of

---

[3] After Detective Mackey finished testifying on direct examination, the Court asked the Government to re-call him to clarify the issue of whether the neighbor actually saw the bald white man place the packages in the Toyota, as the issue was never flushed out during the initial examination. *See* Mackey Test. at 193. Incidentally, law enforcement did not find the packages in Heald's vehicle after it was later searched.

groceries. The Court's review of the police radio recording revealed that Detective Ross at this point said "this guy may have just come and bought a bunch of sandwich baggies to be honest with you." Gov't Ex. 9, at 15:35. Later, Detective Ross states over the radio that something in the grocery bag "appeared to be" baggies but he "couldn't really tell from the distance [he] was at." *Id.* at 28:19.

Detective Ross followed Heald out of the parking lot and witnessed him commit several traffic infractions. Detective Ross then communicated the infractions to SPD officer Guillermo Sanchez,[4] who was travelling in a marked vehicle directly behind him. Officer Sanchez also testified that he witnessed the traffic infractions himself. Officer Sanchez then passed Detective Ross, activated his police lights, and stopped Heald on probable cause of committing traffic violations.

### B.    The Initial Portion of the Stop: Investigating a Traffic Infraction

The mobile video recorder ("MVR")[5] on Officer Sanchez's vehicle, which captured video and audio of the stop, begins filming moments before Officer Sanchez pulls Heald's vehicle over.[6] Heald stops his vehicle at approximately 15:50:47 per the MVR's clock. Once Heald is stopped, Sanchez approaches the vehicle and identifies himself as an SPD officer. He informs Heald that the reason he stopped him was for

---

[4] In addition to the infractions, Sanchez was aware of the detectives' earlier surveillance related to suspected drug trafficking activity. *See* Sanchez Test. at 72.

[5] The MVR recording is also Gov't Ex. 1.

[6] The Court has reviewed the entire video and accompanying audio. The audio includes two channels, one recorded from a microphone on Officer Sanchez's person, and the other from a microphone inside of Officer Sanchez's vehicle. Audio references in this Memorandum Opinion come from the microphone on Officer Sanchez's person, unless otherwise specified. The Court also received an audio recording from "channel four," a station dedicated to the narcotics unit. Gov't Ex. 9.

driving left of center while taking a right turn. Officer Sanchez asks whether he has been drinking alcohol, which Heald denies. Heald then produces his license and registration upon request, and engages in a brief conversation with Officer Sanchez, during which Heald denies having anything illegal in his car or having ever been arrested.

Officer Sanchez returns to his vehicle and asks dispatch to run Heald's information. Dispatch responds that Heald has a valid driver's license.[7] At 15:55:38, Officer Sanchez returns to Heald's vehicle and asks him for consent to search, which Heald denies. After again inquiring into whether Heald has anything illegal in his vehicle, Sanchez says that he was asking because Heald was acting nervous and shaking when he first pulled him over. After a short conversation, Officer Sanchez returns to his vehicle at 15:56:40. While he is back in his patrol car, there is a discussion over the radio—presumably between the two detectives—stating that the on-duty K-9 team was busy with another mission, and that Officer Sanchez would have to wait for an off-duty K-9 team to get to the scene. One of the detectives instructs Officer Sanchez to "get him [Heald] out of the car and develop some small talk with him to start noting any indicators" so that they can articulate why they had to wait for the K-9. Around 16:00:00, Detective Ross asks Officer Sanchez whether he noticed any packaging in the vehicle, and after he replies in the negative, asks him to check whether Heald's grocery bag contains Ziploc baggies. By this point, it is clear that Detective Sanchez has turned his attention from investigating a traffic infraction to detaining Heald until a K-9 unit could arrive to further the narcotics investigation.

---

[7] Officer Sanchez also testified that dispatch informed him that Heald had FBI and Arkansas SIN numbers, a fact which is indicative of criminal history. Sanchez Test. at 108. However, this testimony was not corroborated by a review of the MVR's audio.

5

### C.    The Middle Portion of the Stop: Detention to Further the Investigation into Drug Trafficking

At 16:00:39 a second officer appears on the MVR as he approaches Heald's vehicle along with Officer Sanchez. Officer Sanchez asks Heald to step out of the vehicle, informs him that he is not under arrest, and conducts a pat down. He then leads Heald and the other officer off-camera, to the side of the vehicles, where they remain until the K-9 unit arrives around 16:22:10.[8] The following pertinent conversations occur during this roughly 20-minute period:

- At 16:01:25 Heald reveals that he was at his friend's on Ina Ave. before he was at Harp's, that his friend had been having some issues with a "neighbor lady" the night before, and that the police had been called.

- At 16:02:00 Officer Sanchez tells Heald that he wasn't aware of that situation.

- At 16:03:40 Officer Sanchez asks Heald why he is sweating so much, and Heald responds that it is "hot as hell" and he "smokes two packs a day."

- At 16:04:00 Heald offers that he "got in a little trouble" in Colorado in 1987, and was charged with conspiracy for "meth."

- At 16:07:08 the other officer on the scene asks Heald for consent to search his person, and he declines to give consent.

- At 16:09:00 Officer Sanchez informs Heald that he noticed a straw-like or pen-like object in his vehicle, and asks if Heald knows what it is. Heald replies that he's not sure what it is.

---

[8] The Court does not believe that this action was taken for any nefarious purpose. The weather that day was over 90 degrees and sunny, and there appear to be several trees to the side of the vehicles which would provide shade.

6

- Around 16:11:40 Officer Sanchez explains to Heald that because he was acting nervous during their initial encounter, and because he was sweating profusely, Officer Sanchez had requested a K-9 unit.

SPD Officer Edgar Hernandez arrives with his K-9 partner, "Bosco," at 16:22:10, and begins their open-air drug sniff at 16:24:46.

### D.    Bosco and Officer Hernandez

Bosco is a 3 or 4 year-old German Shepard that was imported from Hungary by Criss Gardner, the owner of Von Klein Stein Working Dogs in Sherwood, Arkansas. Bosco attended Gardner's Working Dogs school beginning in February or March of 2015 to learn to be a narcotics detection dog. After 8 to 10 weeks of training, Bosco's handler, Officer Hernandez, began training with him at the Working Dogs school. Their training together included detection of methamphetamine, in addition to other types of drugs. Bosco was trained to signal the presence of narcotics with a passive alert. This means that when Bosco detects the scent of drugs, he is supposed to sit or lie down. Bosco and Officer Hernandez both performed well at the school. Consistent with this performance, Bosco's SPD training records from April 20, 2015 and May 27, 2015 indicate that he correctly located methamphetamine during training, and his training logs from the months of June and July of 2015 show satisfactory performance across the board. Gov't Exs. 5-8.

Bosco and Officer Hernandez were assigned to work the night shift, from 10:00 p.m. to 6:00 a.m. The team was deployed to conduct open-air drug sniffs on vehicles thirteen times prior to July 16, 2015, all during these nighttime hours. Bosco alerted to the presence of narcotics on ten of those occasions, and officers eventually found

7

narcotics nine of the ten times. The exceptional incident, moreover, involved a driver who admitted that he had recently smoked marijuana in his vehicle. Bosco's field record was, while limited in experience, exemplary in result.

On July 16, 2015, Officer Hernandez was off-duty at Wal-Mart when he was asked whether he and Bosco could perform an open-air drug sniff on Heald's vehicle. While Officer Hernandez was at Wal-Mart, Bosco was in the backyard at Officer Hernandez's house, in over 90-degree heat. Officer Hernandez drove home from Wal-Mart, parked in his driveway with his windows rolled up, turned off his vehicle, and went inside to change into his police protective gear. After he changed into his gear, he brought Bosco out to his vehicle and put him in the back seat. He noticed that the vehicle was hot, and that Bosco was hot. Additionally, the air conditioning did not work well in his vehicle, so the ride from Officer Hernandez's house to Heald's vehicle was hot for Bosco as well. In short, Bosco was very hot by the time he got to Heald's vehicle, and he was not accustomed to working in such conditions, as all of his previous shifts were during the cool of night.

### E.     The Concluding Portion of the Stop: The Open-Air Drug Sniff

Officer Hernandez arrives with Bosco at 16:22:10, and begins their open-air drug sniff at 16:24:46. When the team first appears on the MVR, Bosco is panting and his tongue is drooping out of his mouth. The sniff begins on the front driver side of the vehicle. Officer Hernandez—at this point and frequently throughout the search—uses his hand to guide where he wants Bosco to sniff. As he later testified, this is a method to keep the K-9 focused, and whenever he employs the method, it means that Bosco is not focused on the sniff. (Doc. 29, pp. 54-55). On the first pass by the driver side, Bosco

pays no attention to the car. On the second pass, Bosco follows Officer Hernandez's hand when he flicks his wrist through the open front driver-side window, and briefly places his front paws on the window opening. Officer Hernandez next leads Bosco on an uneventful trip around the back and passenger side of the vehicle, then takes him off camera to down him in the shade. After another brief pass by the passenger side about 30 seconds later, Officer Hernandez again downs Bosco in the shade.

About a minute later, at 16:27:12, Officer Hernandez brings Bosco to the passenger side of the vehicle. On this pass, Bosco places his paws on the rear passenger side door, again after Officer Hernandez places his hand there. The team continues around the front of the vehicle, and along the driver side a few times. On the second pass by the driver side, Bosco again puts his paws on the front window opening after Officer Hernandez points to it. On the fourth pass, Bosco does the same thing, again after Officer Hernandez places his hand in the area.[9] After a few more uneventful passes by the rear and passenger side of the vehicle, Officer Hernandez takes Bosco into the shade at the 16:28:20 mark of the video.

At 16:28:38, Officer Hernandez tells another officer that Bosco is "burning up." Shortly thereafter, an officer asks whether anyone has water for Bosco. Three minutes later, at 16:31:30, Officer Hernandez reinitiates the sniff on the passenger side of the vehicle. Moving around to the driver side, Bosco again places his paws on the window opening. This time, while Officer Hernandez's hand is tracking along the top portion of the side of the vehicle, he does not motion up towards the opening. After a couple more passes by the rear of the vehicle, Officer Hernandez brings Bosco to the shade again.

---

[9] Throughout the video, Bosco is generally either following Officer Hernandez's hand, or is not focused on the vehicle at all.

Around the same time, at 16:32:11, Officer Sanchez's in-car audio recording picks up a conversation between two unidentified persons. The first asks "did they get an indication yet?" and the second responds that it "doesn't appear so."

Officer Hernandez reinitiates the sniff on the passenger side of the vehicle at 16:32:16. On his second run down the passenger side of the vehicle, Officer Hernandez keeps his hand low, apparently as a guide to get Bosco to focus on the lower portion of the vehicle. At 16:32:30, while Officer Hernandez's hand is low, Bosco lies down for an instant. He does this again five seconds later. Officer Hernandez then takes Bosco to the shade, and at 16:33:00 says "he's not even looking, he's fucking burning up . . . let me run him one more time, but he's burning up." Following this statement, the conversation becomes difficult to hear. But, listening in Chambers with noise-cancelling headphones, the Court believes that Officer Sanchez says something along the lines of "I thought it was an alert, like right there" or "I thought it was—what happened right there?"—a reference to Bosco having just lied down twice at the passenger side. It sounds to the Court like Officer Hernandez then responds "well, that's just to kind of to get him to check [inaudible for a couple of seconds] the car, so it's not a—not an alert."[10]

Officer Hernandez begins the final run on the driver side of the vehicle at 16:34:40. On the first pass, Bosco does not pay attention to the vehicle. Officer Hernandez then jerks his leash a bit, and runs Bosco down the driver side again, this time using his hand as a guide. As Officer Hernandez passes by the open front window,

---

[10] This response is consistent with what can be seen on the MVR when Bosco lies down. Namely, that Officer Hernandez appears to be instructing Bosco to lie down, or to at least sniff around the lowest part of the vehicle. Gov't. Ex. 1 at 16:32:29, 16:32:34.

he again flicks his hand in the window. After a short pause, Bosco jumps into the vehicle through the window. This happens at 16:34:49. At 16:34:55, Bosco honks the vehicle's horn. Bosco jumps back out the window at 16:34:59. This essentially concludes the open-air drug sniff.

At 16:36:00, Officer Hernandez says "I'm fucking debating it because he's not supposed to jump in cars like that—*nunca* [never, in Spanish]." At 16:36:25 a noise similar to a microphone being covered can be heard on the recording.[11] The next forty-five seconds are mostly silent, with faint voices barely audible in the background. At 16:37:09 the same noise can be heard again, and seconds later one of the officers says, in Spanish, "it's already been explained."[12]  Then, at 16:37:25, Officer Sanchez says "we're gonna search."[13]

Officer Sanchez then proceeds to search the vehicle, and finds two plastic baggies containing methamphetamine, a meth pipe, syringes, and a scale all in the center console. Shortly thereafter, the MVR stops recording.  Law enforcement later located a firearm and a cell phone in the trunk of the vehicle, and then found incriminating information on the cell phone after obtaining a warrant to search it. Heald was arrested at the scene.

---

[11] The Court does not make the finding that Officer Sanchez intentionally covered his microphone. However, given the initial noise and the ensuing silence, the Court finds it likely that his microphone was obstructed during the next forty-five seconds.

[12] The Spanish phrase is "ya se ha explicado."

[13] Both Officer Sanchez and Officer Hernandez testified that it was Officer Hernandez who gave the go-ahead to search, and the Court credits this testimony. In other words, when Officer Sanchez said "we're gonna search," the Court finds that he was relaying this information over the radio, *after* Officer Hernandez had already given him the go-ahead to search.

A grand jury returned an Indictment (Doc. 1) on September 16, 2015, charging Heald with one count of possession with intent to distribute methamphetamine, and one count of being a felon in possession of a firearm. Heald moved to suppress the evidence against him on November 17, 2015 (Doc. 17). His Motion offers two constitutional bases to suppress the evidence. First, it argues that the extension of his stop beyond the time reasonably necessary to investigate and issue a citation for a traffic infraction violated the Fourth Amendment. Second, it argues that the open-air drug sniff did not produce a reliable alert sufficient to create probable cause to search his vehicle under the Fourth Amendment.

The Government filed a Superseding Indictment (Doc. 19) on December 9, 2015, adding a charge of possession of a firearm in furtherance of a drug trafficking crime. Heald is currently incarcerated, and has been since his arrest. The Court began a suppression hearing on January 27, 2016, at which Detective Mackey, Detective Ross, Officer Sanchez, and Officer Hernandez testified for the Government, and Steven Nicely testified for Heald as a K-9 specialist. The Court adjourned the hearing until February 8, 2016, at which time Criss Gardner testified as a K-9 specialist and the trainer of both Bosco and Officer Hernandez.

## II.   LEGAL STANDARD

 The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

As law students have been taught for decades, a police officer needs a reasonable, articulable, particularized suspicion of criminal activity in order to initiate a seizure in compliance with the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968). Judging the facts to determine whether this standard has been met is an objective task. The Court must ask whether "the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id.* at 21-22 (quotation omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Maltais*, 403 F.3d 550, 554 (8th Cir. 2005) (quoting *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994)). Importantly, the "collective knowledge of law enforcement officers conducting an investigation is sufficient to provide reasonable suspicion, and the collective knowledge can be imputed to the individual officer who initiated the traffic stop when there is some communication between the officers." *United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008).

In the traffic-stop context, "[l]ike a *Terry* stop, the tolerable duration of police inquiries . . . is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (internal citations omitted). Accordingly, authority for the stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* Any unrelated inquiries that "measurably extend" the duration of the stop cause it to run afoul of the Fourth Amendment. *Id.* (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). This is so *unless* the police officer develops the reasonable

13

suspicion "ordinarily demanded to justify detaining an individual." *Id.* "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) (internal quotation omitted). "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *Id.*

Reasonable suspicion alone, however, is insufficient to justify the search of a vehicle under the Fourth Amendment. Instead, the police are required to have probable cause. "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013) (quotations and alterations omitted); *see also United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) ("Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."). Taking this "practical and common-sensical" approach, the Supreme Court has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Harris*, 133 S. Ct. at 1055*; see also Illinois v. Gates*, 462 U.S. 213 (1983) (affirming a totality-of-the-circumstances approach to probable cause).

## III.    DISCUSSION

### A.    Officer Sanchez Had Reasonable Suspicion to Prolong Heald's Traffic Stop

The Court finds that Officer Sanchez had reasonable suspicion to expand the scope of his investigation beyond the traffic infractions for which he originally stopped

14

Heald. Heald contends that Officer Sanchez based his reasonable suspicion determination solely on his opinion that Heald was acting nervous and sweating profusely, and that such a basis is insufficient under Eighth Circuit case law. *E.g.*, *United States v. Jones*, 269 F.3d 919, 929 (8th Cir. 2001) (nervousness, inconsistent statements about criminal history, and poor driving are insufficient to create reasonable suspicion); *United States v. Beck*, 140 F.3d 1129, 1137 (8th Cir. 1998) (finding nervous demeanor, hands shaking, driving a car rented by a third party, and more to be insufficient to create reasonable suspicion). The Court agrees that it would be quite remarkable to conclude that sweating on a hot Arkansas afternoon in July, and appearing nervous—even exceptionally so—when stopped by the police create reasonable suspicion. Such a finding would give law enforcement *carte blanche* to extend the duration of traffic stops during the hot summer months.

But, Officer Sanchez's basis for having reasonable suspicion of criminal activity is stronger than Heald lets on. Namely, Officer Sanchez had knowledge of Heald's presence at a suspected drug-trafficking house, and was working with a team of law enforcement officers who observed Heald at the house. At the suppression hearing, Detective Mackey testified that Officer Sanchez was "working with [him] on this case" as a member of "the crime suppression unit" which "assist[s] the specialized units such as . . . narcotics . . . on whatever they need done with a uniformed patrol officer." Mackey Test. at 18. He also testified that Officer Sanchez "was briefed that we were watching a house due to suspicion of narcotics trafficking." *Id.* at 18-19.[14]

---

[14] Moreover, even if the detectives did not fully communicate their knowledge of the events at 2014 Ina Ave. to Officer Sanchez, their knowledge is attributable to him through the collective knowledge doctrine. Reasonable suspicion, like probable cause,

This knowledge distinguishes the instant case from an ordinary traffic stop. With an ordinary traffic stop, where the seizing officer has no advance knowledge of any possible criminal activity, the officer's reasonable suspicion must necessarily be premised on facts learned during the stop. *See United States v. Riley*, 684 F.3d 758 (8th Cir. 2012); *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007); *Linkous*, 285 F.3d at 716; *Jones*, 269 F.3d at 919; *Beck*, 140 F.3d at 1129 (all involving ordinary traffic stops and analyzing reasonable suspicion based on events that occurred during the stops). Where the seizing officer has advance knowledge of suspected criminal activity, however, reasonable suspicion can be based on this knowledge in addition to facts learned during the stop. *See United States v. Stringer*, 739 F.3d 391 (8th Cir. 2014); *United States v. Williams*, 429 F.3d 767 (8th Cir. 2005); *United States v. Zuniga*, 613

---

"may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is *some degree of communication.*" *United States v. Twiss*, 127 F.3d 771, 774 (8th Cir. 1997) (emphasis in original) (citing *United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993)). As the Eighth Circuit explained in *United States v. Gillette*, the doctrine is used "to impute the knowledge of one officer to the other officers to uphold an otherwise invalid search or seizure." 245 F.3d 1032, 1034 (8th Cir. 2001). The requirement that there be "some degree of communication" between the officers "serves to distinguish between officers functioning as a search team, and officers acting as independent actors who merely happen to be investigating the same subject." *Id.* (citations and quotation omitted).

In *Gillette*, the degree of communication between officers that the Eighth Circuit required to apply the doctrine can only be described as *de minimis*. There, an officer on the scene of a drug bust obtained a homeowner's consent to search his property, including a truck parked in his driveway. Although the truck actually did not belong to the homeowner, the officer would have been permitted to search the truck in reasonable reliance of the homeowner's consent. However, the truck was in fact searched by a different officer, who independently would have lacked probable cause or consent for the search. The Eighth Circuit held that the first officer's knowledge of the homeowner's consent was imputed upon the second officer by sole virtue of the fact that the second officer had been called to the scene to assist in the ongoing investigation. *Id.*

Fed. Appx. 501 (6th Cir. 2015) (all analyzing reasonable suspicion based in part on suspicion of criminal activity occurring before the stop).

Whether Officer Sanchez's knowledge[15] of the happenings at 2014 Ina Ave. was sufficient to constitute reasonable suspicion is partly dependent upon information provided to Detective Mackey by a police informant—the concerned citizen. Detective Mackey received a tip from the concerned citizen that her neighbor had been engaging in suspicious activity, which Detective Mackey thought was indicative of drug trafficking. Because reasonable suspicion "is dependent upon both the content of information possessed by police *and its degree of reliability*," the concerned citizen's veracity is a factor the Court must consider in its totality-of-the-circumstances evaluation. *Alabama v. White*, 496 U.S. 325, 330 (1990) (emphasis added).

The Court finds that the concerned citizen's tip was reliable. The tip included very specific descriptions of conduct that she personally witnessed. *See Navarette v. California*, 134 S. Ct. 1683, 1689 (2014) (discussing how specific, eye-witness tips are more reliable than other types of tips). Detectives Mackey and Ross were able to corroborate some of the details of her tip through independent police work. On July 16, 2015, they observed a Chevy Blazer backed into a driveway with the doors open and someone kneeling by one of the doors as he was working on it. This is consistent with the activity the concerned citizen claimed to have witnessed on prior occasions. Moreover, that the detectives were able to corroborate those facts increases the credibility of other information provided by the concerned citizen. *Accord White*, 496 U.S. at 325 (police officers' corroboration of certain innocent details of an anonymous tip

---

[15] Or, perhaps more accurately, the collective knowledge of the law enforcement team.

created reasonable suspicion); *Gates*, 462 U.S. at 241 ("Our decisions . . . have consistently recognized the value of corroboration of details of an informant's tip by independent police work."). The detectives, and by extension Officer Sanchez, could thus attribute some credibility to the concerned citizen's assertions about having seen people carrying packages from the Chevy Blazer to the garage, and about having seen a bald white man carry two packages towards the Silver Toyota (but not knowing whether he carried them into the vehicle).

Taking a totality-of-the-circumstances approach, the Court finds that the detectives' first-hand observations, together with their reasonable reliance on the non-corroborated portions of the concerned citizen's tip, created reasonable suspicion of criminal activity. This reasonable suspicion is attributable to Officer Sanchez either through his communications with the detectives, or through the collective knowledge doctrine. Accordingly, Officer Sanchez had the reasonable suspicion of criminal activity necessary to prolong the duration of Heald's seizure beyond the time necessary to investigate a traffic infraction.[16]

### B. Bosco's Sniff Was Not Up to Snuff

The Supreme Court recently detailed the standard for determining whether a K-9's alert is sufficient to create probable cause. The petitioners in *Florida v. Harris* asked the Supreme Court to reverse the Florida Supreme Court's holding that a wide array of evidence was necessary to establish a K-9's reliability. 133 S. Ct. at 1055. The evidence required by the Florida court included the K-9's performance history, training and certification records, and instances of false alerts. *Id.* Based on the K-9 officer's

---

[16] In reaching this conclusion, the Court places no weight on Officer Sanchez's observations that Heald was nervous and sweating.

failure to maintain such information, the Florida court found that the officer could not consider his K-9 to be a reliable indicator of drugs. *Id.*

The Supreme Court reversed. It explained that it had consistently "rejected rigid rules, bright-line tests, and mechanistic inquiries" to determine probable cause, "in favor of a more flexible, all-things-considered approach." *Id.* Holding that the Florida court had "flouted" that approach, the Court held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.* at 1056, 1057. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Id.* at 1057. This standard, however, does not allow the government to use a K-9's certification as a rubber stamp to show reliability. A defendant "may contest the adequacy of a certification or training program," "examine how the dog (or handler) performed in the assessments made in those settings," introduce "evidence of the dog's (or handler's) history in the field," or ague that "circumstances surrounding a particular alert may undermine the case for probable cause." *Id.* at 1057-58. With respect to the latter argument, the case for probable cause could be undermined if, for example, "the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions." *Id.* at 1058. Ultimately, the question for the Court "is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Id.*

As an initial matter, the Court can find no fault with Bosco's (or Officer Hernandez's) training and certification records. Despite Heald's argument to the contrary, these records are certainly sufficient to allow the Court to presume that an alert from Bosco would generally be a reliable indication of the presence of narcotics. It is, instead, the circumstances surrounding Bosco's supposed alert that lead this Court to doubt its reliability.

To begin, Bosco had never conducted a single sniff in the field during the day time, let alone in over 90-degree heat.[17] Add to this the fact that Bosco had been in Officer Hernandez's backyard in the heat for some time that day, and then travelled in a hot car before arriving to the scene, and any reasonable person would begin to question Bosco's ability to reliably perform.[18] Indeed, Officer Hernandez himself testified that on a

---

[17] Moreover, the two training logs received into evidence list the training conditions as "windy/cool" and "calm cool." Gov't. Exs. 5, 6. And, the times listed on the monthly training records reveal that only one training session was conducted in the afternoon, while the other fifteen were all in the morning, evening, or night. Gov't. Exs. 7, 8.

[18] The Government relies on *United States v. Winters*, 600 F.3d 963 (8th Cir. 2010), for the proposition that the heat's effect on Bosco did not impact the reliability of his supposed alert. The Court disagrees. In *Winters*, the K-9 handler admitted that his K-9 was acting lethargic during the drug sniff in question. *Id.* at 967. The next day, the K-9 needed treatment to remove a pocket of blood from his head. *Id.* Nonetheless, the Eighth Circuit held that the K-9's alert was sufficiently reliable to create probable cause. *Id.* at 968. *Winters* is materially distinguishable from the instant case in at least four respects. First, the *Winters* Court was affirming a district court's finding on the very deferential clear error standard of review. While often overlooked, the standard of review employed by an appellate court is a crucial factor in determining the breadth of its holding. Second, the K-9 handler in *Winters*, though aware of his K-9's lethargic behavior, did not learn that the root cause of this behavior was a medical condition until after the fact. This *ex post facto* knowledge could not have been considered in the probable cause analysis. In the instant case, Officer Hernandez knew that Bosco was acting abnormally, knew the cause of his impairment, and verbalized how it was negatively affecting Bosco's ability to perform. Third, there was no question in *Winters* that the K-9 alerted. The only question was whether that alert was reliable. In the instant case, however, Heald questions whether Bosco even alerted. Fourth, the Court

scale of 1 to 10, with 10 being concerned that Bosco was about to die, he was at a 7 that day. (Doc. 29, p. 25). Moreover, Officer Hernandez knew that the heat was in fact affecting Bosco's performance. He stated at the time that Bosco was "fucking burning up" and "not even looking." *Id.* at 164. This cause for concern was, ironically, at least somewhat corroborated by the Government's own expert. Criss Gardner testified that, in viewing the MVR, he "immediately could see a dog that was overheated," and that the high heat would "absolutely" affect Bosco's performance or actions. Gardner Test. at 12. Remarkably, after Mr. Gardner had commented that Officer Hernandez appeared frustrated with Bosco, he stated that "most dogs that get frustrated or really want to get out of the heat, they will give you a sit response in some cases. Again, you know, they will try to sit to appease the handler." Gardner Test. at 20-21.[19] In other words, an overheated and frustrated dog, like Bosco was that day, is prone to giving false alerts.

Second, Bosco was not trained to alert by jumping through an open vehicle window. Instead, Bosco was trained as a passive alert dog, meaning that he sits or lies down to display final indication when he detects the presence of narcotics. While other changes of behavior can signal the presence of drugs, they are inherently less reliable

---

considers the heat's effect on Bosco as just one of several factors in a totality of the circumstances approach. As compared to *Winters*, there are simply more additional reasons to doubt the K-9's reliability in the instant case.

[19] Mr. Garnder was, nonetheless, insistent that Bosco had alerted to the presence of narcotics several times, that Officer Hernandez simply was not on his game and missed the alerts, and that the alerts were reliable. While the Court generally finds that Mr. Gardner's testimony was credible, it discounts this particular opinion in light of his earlier testimony concerning frustrated or overheated K-9s and the increased risk of a false alert.

than the trained method of indicating.[20] *Accord United States v. Heir*, 107 F. Supp. 2d 1088, 1091 (D. Neb. 2000) (dog who changed his sniffing pattern, but was trained to indicate by scratching, did not create probable cause); *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993) (differentiating between a dog "showing interest" by nosing and scratching a package and a dog making an "full alert" to the presence of narcotics, in the context of a warrant application). Indeed, Officer Hernandez was uncertain about whether Bosco's leap even constituted an alert. He stated to Officer Sanchez that he was "fucking debating it" because Bosco is never supposed to jump in cars. Gov't Ex. 1 at 16:36:00. The Court believes that a reasonable person would no doubt share Officer Hernandez's skepticism. An overheated dog exhibiting a new and untrained behavior is not a shining example of reliability.[21]

Third, and relatedly, law enforcement's actions during and after the open-air drug sniff illustrate the uncertainty of whether Bosco alerted at all, and if he did, whether the alert was reliable. After Officer Hernandez's verbal expression of uncertainty (Gov't Ex.

---

[20] The Court does not intend to imply that anything less than a full, final indication is inherently unreliable. On the contrary, in most circumstances such actions may be reliable. *See United States v. Holleman*, 743 F.3d 1152 (8th Cir. 2014); *United States v. Parada*, 577 F.3d 1275, 1281-82 (10th Cir. 2009); *United States v. Clayton*, 374 Fed. Appx. 497, 500-02 (5th Cir. 2010) (all distinguishing behavior that constitutes an alert from a dog's trained final indication, and finding an alert to be sufficient for probable cause purposes). The Court's point is that on a spectrum of reliability, a final indication consistent with the K-9's training is at the most reliable end, and other changes of behavior fall somewhere short of that. As the Court makes clear below, this fact alone— in isolation—would not cause it to doubt Bosco's reliability. Rather, it is one factor viewed in combination with several others identified by the Court herein, including, for example, Officer Hernandez's uncertainty about whether Bosco's jump could even be classified as an alert.

[21] This finding is further supported by Mr. Gardner's testimony that Bosco's and Officer Hernandez's performance did not match up well with a prototypical sniff or alert. Gardner Test. at 42-43.

1 at 16:36:00), the Court finds that Officer Sanchez's microphone was obstructed. Thus we do not know how Officer Hernandez went from "debating it" to determining that Bosco's jump was an alert creating probable cause. What we do know, however, is that after viewing the MVR *ex post facto*, Officer Hernandez chose to omit Bosco's jump from his written report, and instead wrote that Bosco provided a final indication on the *passenger side* of the vehicle. *See* Doc. 29, pp. 46-51. To muddy the waters further, this statement was a reference to Bosco's lying down around the 16:32:30 mark of the MVR. In the moment, however, Officer Hernandez explained to Officer Sanchez that "it's not a—not an alert," seemingly because Officer Hernandez was instructing Bosco to sniff the lower portion of the vehicle. Gov't. Ex. 1, at 16:33:23. Consistent with this, Officer Hernandez can be seen on the MVR motioning for Bosco to sniff the bottom part of the vehicle.[22] *Id.* at 16:32:29, 16:32:34.

None of this is to say, or suggest, that Officer Hernandez's conduct was dishonest. Rather, the Court agrees with his own assessment—that he was "not on his game" that day—and further believes that he was not on his game when he later wrote his report. (Doc. 29, p. 55). Thus, to an overheated K-9 working in unfamiliar conditions,

---

[22] Further, given the inconsistencies between what Officer Hernandez said and did in the moment, and what he later wrote in his report and testified to on the stand, it is plain that he was distracted during the open air sniff, that his recollection about the sniff is uncertain at best, and that his testimony is entitled to little weight. Thus the Court significantly discounts his additional testimony to the effect that Bosco put his nose and paws in the area of the center console after he jumped into the vehicle. (Doc. 29, pp. 57-58). Moreover, even if the Court were to credit this testimony, it would not affect the Court's probable cause determination. When a dog of Bosco's size jumps into the front seat of a vehicle, his front paws and head naturally end up around the center console. As the MVR's audio reveals, within a few seconds of entering the vehicle, Bosco honks the horn on the steering wheel. This presumably occurs while he is turning around to exit the vehicle. Thus, it is unremarkable to the Court—and certainly not a reliable basis for finding probable cause—that a dog may briefly sniff the area where his front paws naturally land when entering into a new environment.

exhibiting a behavior that he was not trained to exhibit, the Court can add an understandably distracted handler, who, to boot, flip-flopped on how and whether Bosco alerted: In the moment, Officer Hernandez was debating whether Bosco's jump was an alert. And then later, he identified as an alert a behavior (Bosco's lying down) that he said in the moment was not an alert.[23]

Fourth is the issue of unintentional cueing. The Court cannot help but observe that whenever Bosco was focused on the vehicle, he followed Officer Hernandez's hand almost the entire time. When Officer Hernandez had his hand low, Bosco sniffed low; when he had his hand high, Bosco sniffed high. When he flicked his wrist towards the open window, Bosco jumped on the window opening, or jumped through that opening. While Mr. Gardner and the defense K-9 specialist, Mr. Nicely, differed on whether this conduct could lead to unintentional cueing, the Court believes, after closely viewing the MVR several times, there is a *possibility* that it did here.

Fifth, and finally, the duration of the open air sniff was unusually long. *See* Doc 29, pp. 17-18. Though normally an innocent factor, in the context of this specific case, the Court believes it is notable. This is so in large part because as the minutes passed, Bosco's exposure to the heat became prolonged, and so his ability to perform continued to diminish.[24]

---

[23] The Court believes that Officer Hernandez and Bosco will have a long, successful, law enforcement career together. But as Officer Hernandez admitted, on this day, he was understandably distracted out of concern for his four-legged partner.

[24] Mr. Gardner's testimony supports this inference. For example, he testified that dehydration would "absolutely" affect Bosco's performance, and that Officer Hernandez having to find water for Bosco during the middle of the sniff "absolutely" indicated that Bosco was dehydrated. Gardner Test. at 44.

Any one of the above factors alone would not be sufficient to render Bosco's supposed alert unreliable. The mere fact that it was hot out is alone not enough; that Bosco previously only worked in the cool of the night is alone not enough; that the heat admittedly affected Bosco's performance is alone not enough; that Bosco was often not paying attention is alone not enough; that his supposed alert was not how he was trained to indicate is alone not enough; that Officer Hernandez was off his game and distracted is alone not enough; that he could not readily determine whether Bosco alerted is alone not enough; that he later changed his version of how Bosco alerted is alone not enough; that there was some possibility of unintentional cueing is alone not enough; and that the sniff lasted an abnormally long time is alone not enough. But, taking all of these facts together, and viewing them in the totality of the circumstances, a reasonable person would not think that Bosco's actions created a reliable alert, such that a search would reveal contraband.[25]

These factors, to be clear, lead the Court to two related conclusions. First, that there is insufficient evidence to conclude that Bosco actually alerted to the presence of narcotics. Second, that even assuming *arguendo* that Bosco's jump did constitute an alert, it was not sufficiently reliable to establish probable cause. Accordingly, law enforcement's subsequent search of Heald's vehicle violated the Fourth Amendment. The evidence found as a result of that search—including the physical evidence in the

---

[25] Nor did the police have probable cause to search Heald's vehicle absent a reliable K-9 alert based on the happenings at 2014 Ina Ave. The Court concurs with Detective Ross's and Officer Sanchez's assessments on this issue. Ross Test. at 69; Sanchez Test. at 99; *accord United States v. Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015) (declaring that "a mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property," even in the reasonable suspicion context).

vehicle, the evidence later found on Heald's cell phone, and any incriminating statements made by Heald following the search—must be suppressed pursuant to the exclusionary rule. *See Wong Sun v. United States*, 371 U.S. 471 (1963); *Mapp v. Ohio*, 367 U.S. 643 (1961).

In closing, the social cost of suppressing evidence, and potentially letting a factually guilty person walk free, is not lost on this Court. Nor, however, is the social cost of allowing the police to search a person or his property in violation of the Fourth Amendment. The well-established exclusionary rule settles the constitutional balancing of these social ills. In such cases, the Fourth Amendment must, indeed, prevail.

## IV.    CONCLUSION

The Court finds that Officer Sanchez had reasonable suspicion to prolong the duration of Heald's stop. However, the Court finds that law enforcement did not have probable cause to search his vehicle. Heald's Motion to Suppress will, therefore, be **GRANTED**. The Court will effectuate these findings by separate order entered on the same date as this Memorandum Opinion.

**IT IS SO ORDERED** on this 25th day of February, 2016.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE